IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 10, 2007

## STATE OF TENNESSEE v. DAVID MILKEN

**Appeal from the Criminal Court for Shelby County**
**No. 04-07182      Chris Craft, Judge**

---

**No. W2006-01850-CCA-R3-CD  - Filed September 21, 2007**

---

The defendant, David Milken, was convicted of first degree felony murder and especially aggravated robbery, a Class A felony.  He received concurrent sentences of life and twenty years.  On appeal, he contends that the evidence was insufficient to support his convictions and that the trial court erred in admitting certain photographs into evidence.  We conclude that no error exists, and we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which DAVID G. HAYES and ALAN E. GLENN, JJ., joined.

Gregory Thomas Carman, Memphis, Tennessee, for the appellant, David Milken.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Alanda Horne Dwyer and Michelle L. Kimbril-Parks, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The defendant was indicted, along with Charles Curtis and Willis Ayers, for felony murder and especially aggravated robbery in connection with the homicide of Charlie Jackson, Jr.  At the trial, the victim's father, Charlie Jackson, Sr., testified that the victim was thirty-one years old when he was killed.  He said the victim drove a Cadillac, and he identified photographs of a burned burgundy-colored Cadillac as the victim's car.

Memphis Police Officer Jeff Sealy testified that shortly after midnight on April 23, 2004, he was on duty when he found a deceased male at Will Carruthers Park, at the corner of Levi and Neely

roads in Shelby County.[1] Officer Sealy saw a gunshot wound on the victim's forehead. Officer Marlon Wright with the Memphis Police Department Crime Scene Investigation unit, testified that he was called to Will Carruthers Park at approximately 12:30 a.m. on April 23, 2004. He said he arrived there at approximately 1:00 a.m. and took photographs and drew sketches of the scene. He said the victim was lying on his back in the parking lot. He noticed abrasions on the victim's stomach area and bruising on the victim's face. He said there appeared to be blood on the ground near the victim in a pattern that indicated the victim may have been dragged on the ground. He identified several objects he found on the ground near the victim, including a dime, the wick of a cigarette lighter, various parts of a broken cellular telephone, the victim's driver's license, and a cigarette lighter. He said that ten cents worth of change was found in the victim's pocket and that no other money was found on the victim. On cross-examination, Officer Wright stated that he did not know if someone had taken things from the victim's pockets or broken the telephone after the victim was left in the park. He also said it was possible some of the items found were on the scene before the victim was brought there. He said that he did not personally do fingerprint processing on the items recovered from the scene but that, to his knowledge, no fingerprints of the defendant were found.

Memphis Police Officer Bryan Davis testified that he received a call between 1:00 and 2:00 a.m. on April 23, 2004, regarding a burning car. He responded to the call and found that the car was a Cadillac. He traced the tags on the car and discovered that it was registered to Angela Morton.

Angela Morton testified that the victim was her first cousin. She said she spent the day on April 22, 2004, with the victim, as they both attended a peewee football practice involving the victim's nephews and Morton's son. She said the practice started at 5:00 and ended at dusk. Afterwards, the victim went to Morton's house, where they watched television. She said that the victim left her house around 8:00 p.m. and that she called him around 9:00. She said the victim was going to celebrate his cousin's birthday. She said she did not talk to the victim again that night and found out the next morning that he had been killed.

Ms. Morton testified that the victim drove a 1991 Cadillac, which was registered in her name and which she later discovered had been burned. She said that after it was burned, she went to retrieve from the car's trunk the football equipment that the children used. She said she was with the victim when the victim put the equipment, consisting of football pads and helmets, in his trunk following football practice on April 22. She said the equipment was not in the trunk when she went to get it from the impound lot. Ms. Morton identified the facing of a cellular telephone that she said belonged to the victim. She said the telephone was registered in her name because the victim was on a family share plan with her. Ms. Morton said the victim did not carry a wallet but kept his money loose in his pocket.

Tabitha Bender, a customer operations manager for Cricket Communications, identified cellular telephone records of the telephone registered to Ms. Morton and used by the victim. She

---

[1] Officer Sealy in fact said the date was April 22, 2004, but as he later said the time was shortly after midnight, we discern that the correct date was April 23, 2004.

testified that the records showed several outgoing and incoming calls from and to the same telephone number within a short period of time, starting around 11:20 p.m. on April 22, 2004, until around 12:30 a.m. on April 23, 2004.

Memphis Police Sergeant Anthony Mullins testified that he was involved in the investigation of the victim's murder. He said the only fingerprints found on the victim's cellular telephone were the victim's. He said he subpoenaed the victim's cellular telephone records, which he did not receive until June 2004. He noticed several incoming and outgoing calls from and to the same telephone number near the time the victim was thought to have been killed. He said he traced this telephone number to an apartment about a mile and a half from Will Carruthers Park and near where the victim's burning car was found. He said he discovered that Monica Terry lived in that apartment with her boyfriend, the defendant. He said he went to the apartment on June 19, 2004, and took the defendant to the station, where he was interviewed and arrested. Sergeant Mullins testified that Sergeant Tim Simms was the case coordinator in the victim's homicide investigation. He said Simms was deceased at the time of the trial.

Memphis Police Lieutenant Lezly Currin testified that she assisted Sergeant Simms with the investigation of the victim's death. She said that she and Simms located the defendant on June 14, 2004, and took a statement from him on that date. She said a second statement was taken from the defendant on June 19, 2004. She said the defendant was not handcuffed while he gave this statement. She said he was advised of his rights, said he understood them, and stated he wished to make a statement. In the June 19 statement, the defendant said his first statement on June 14 was not true. He said Willis Ayers, who was nicknamed "Blue," shot the victim in the presence of the defendant and Charles Curtis, nicknamed "Da Da." He stated that the following occurred:

> On April 22nd, Da Da, Charles Curtis made a phone call from my house phone to a man about some cocaine and weed, but the plan was . . . for him to get set up to get robbed. Da Da told me and Blue that when the guy pulled up that Blue was gonna stand downstairs and I was gonna stand on my porch upstairs. He said that when he gave the signal for us to walk passed [sic] the car. When we walked past the car, Blue was to come back and pull the pistol on dude and was supposed to rob him. The guy came in a burgundy Cadillac. He pulled right in front of my house. Da Da got in the passenger side of the car. He waited about five minutes. Blue was standing downstairs at the bottom of the steps and I was standing on my porch upstairs. Da Da gave us the look. I came downstairs. Me and Blue walked passed [sic] the car. We walked passed [sic] the front of the car. When we turned around and walked back passed [sic] the front of the car. I stood in front of the car, Blue went to the passenger window, pointed the gun at dude and told him "You know what this is". The guy reached for the gun. When he reached for the gun, Blue shot him. When Blue shot him he left. Da Da got out and pulled the driver to the passenger seat and told me to drive the car. Da Da got

-3-

in the back seat and told me to drive to Neely Park. Da Da was giving me directions on how to get there. When we got there, Da Da got out, pulled the guy out the car and left him on the ground. Da Da busted the dude's cell phone. He slammed it on the ground. Da Da got back in the car and told us . . . let's go. On the way going back, I told Da Da that I needed to go home. He told me to stop at Marlowes. When we got to Marlowes he told me to stay in the car and he would be right back. I waited a couple of minutes. I got and went in Marlowes. When I got in there he introduced me to a girl in Marlowes. I think her name is Keisha but I'm not sure. I told him I was ready to go that I needed to get home. Then we left. When we got back to Summit Park [apartments], I parked the car in the parking lot by the expressway. I got out, went in the house and about five minutes later Da Da came to the house with some football equipment. He asked me for some lighter fluid because they were going to burn the car up. I gave him the lighter fluid. Da Da told me that him and Blue were taking the car to some apartments across the street to burn it up. About fifteen or twenty minutes later Da Da and Blue came back to the house. Da Da cooked the powder cocaine up in my kitchen. While Da Da was cooking up the powder cocaine, he told me and Blue that he only got about twenty something dollars from the dude. Then he split the crack up between me, him and Blue. I got six rocks, him and Blue got seven a piece. Then about thirty minutes after that he called somebody from my house phone to come and get him. He took the football equipment and left.

In the statement, the defendant said that the victim was shot once on the right side of his forehead, that he helped push the victim out of the car while Curtis pulled, and that only Ayers was armed with a weapon. He said the football equipment came from the victim's trunk. The defendant said he understood that he was to read the statement and place his initials on each page and sign and date the statement if it was true. Lieutenant Currin said the defendant gave the statement in answer to questions by Sergeant Simms and that he was not threatened or coerced into giving the statement.

Lieutenant Currin said on cross-examination that before the written statement was given, the defendant gave Simms information that was not included in the final statement, including that Ayers was a gang member. In the defendant's June 14 statement, which he later repudiated, the defendant did not mention Ayers and said that Curtis was the last person he had seen with the victim. In the June 14 statement, the defendant did not state that he had any involvement in a robbery or in the death of the victim. Currin explained that each page of both statements included the defendant's initials.

Elaine Shelby, an investigator working with the District Attorney General's office, testified that she was asked to locate Monica Terry. She said Ms. Terry's mother informed her that Terry passed away in November 2004.

Dr. Thomas Deering testified that he was an Assistant Medical Examiner and an expert in the field of forensic pathology. He performed an autopsy on the victim, Charlie Jackson, Jr., and he described the victim's external injuries as a gunshot wound on his forehead, swelling of his face and two black eyes, gunpowder stipple around his face, and two small abrasions on the back of his left wrist. He conducted an internal examination of the victim and found that the victim had a fractured skull and skull base due to the gunshot wound to the head. He said he recovered the bullet from the victim's brain. He said the skull fracture likely caused the bruising to the victim's face. He said he did not see evidence of strike marks on the victim's face. He explained that stipple were small red marks caused by unburned or partially burned bits of gunpowder making contact with the victim's skin. He said that stipple occurs when the end of the barrel is close to the victim and that the "rule of thumb" when stipple is present on a victim is that the gun was twenty-four inches or closer to the victim when it was shot. He said that because a lot of soot was not visible on Jackson, the gun was probably more than six inches away from him when he was shot. He said his estimation that the gun was six to twenty-four inches away from the victim at the time of the shooting was consistent with the victim being shot while in the driver's seat of a car by someone reaching through the passenger's seat. He said the stippling appeared more on the right side of the victim's face than the left side because the bullet entered more into the right side of the victim's head. Dr. Deering identified two photographs of closeups of the victim's eyes while Dr. Deering held them open. The photographs showed red dots in the eyes that Dr. Deering believed were caused by stipple. He said this indicated that the victim's eyes were open and that the victim was facing the gun when he was shot. He testified that the victim's manner of death was homicide and that the cause of death was an "intermediate range gunshot wound to the forehead."

The defendant testified that he was living with his fiancee, Monica Terry, in the Summit Park apartments on April 23, 2004. He said he met Charles Curtis in the Summer of 2001 at the neighborhood pool but that Curtis later left the apartments and then returned in April 2004. He said Curtis had stayed in his apartment for a short while after his return but that he was not staying with him on the day of the victim's death. He said that on that day, he was with Terry and one of Terry's friends in their apartment when Charles Curtis arrived and asked to use the defendant's telephone. He said Curtis first used the defendant's telephone in the morning and later returned between 4:00 and 6:00 p.m. He said Curtis again used his telephone between 8:00 and 9:00 p.m. He said he heard Curtis on the telephone in the bedroom talking about buying "weed." The defendant said he left the room because he did not "deal with drugs." He said that after Curtis left, the defendant left the apartment because he wanted to get some beer. He said he was walking to his car around 9:30 p.m. when he saw Willis Ayers standing beside a Cadillac on the passenger's side. He said Ayers lived in his neighborhood and that he had known Ayers for about two and a half years, although he said he was not good friends with Ayers. The defendant said that he heard Ayers holler, "you know what this is," and that he then heard a gunshot. He said he stopped, saw Ayers holding a gun, and was scared. He said that Ayers walked in his direction and that Curtis got out of the car. He said they yelled at him to drive the car. He said he got into the victim's car as instructed because he was afraid for his life and did not feel that he had a choice. He said that Ayers was holding a gun and that he knew Ayers was a gang member who had tear drop tattoos on his neck that symbolized how many people he had killed. He said that after he got into the car, Ayers walked off.

The defendant testified that Curtis sat in the backseat of the victim's car and gave him directions to Neely Park.[2] He said Curtis told him they were going to the park to get rid of the body. He said that during this time, he was afraid for his life. He said it occurred to him that Curtis might be taking him to the park to kill him. He said that when they got to the park, Curtis told him to drive to a certain spot, where Curtis got out, opened the passenger door, and began pulling the victim out of the car. He said Curtis yelled at him to help push the victim out of the car, which he did. He said Curtis slammed the victim's cellular telephone against the ground. He said Curtis returned to the car and instructed him to drive to Marlow's. At Marlow's, the defendant sat in the car for two or three minutes while Curtis went inside. He said he did not drive off and leave Curtis at this time because he did not want Ayers to see him come home without Curtis. He said he was afraid for himself and his fiancee. He said that after they left Marlow's, they returned home. He said he gave Curtis the keys to the victim's car and went to his apartment. He said that about five minutes later, Curtis came to his apartment carrying football pads and helmets and told him that he and Ayers needed lighter fluid so they could burn the victim's car. The defendant gave Curtis lighter fluid, and Curtis and Ayers left and returned about thirty minutes later. He said that Curtis asked to use his telephone again, which he allowed, but that he did not allow Curtis to leave his clothes with the defendant as Curtis requested. He said Curtis soon left and took the football equipment with him. He said he did not call the police at any time because he was afraid Curtis and Ayers would do something to him or his family.

The defendant testified that he gave a statement to Sergeant Simms on June 14, 2004, and that the statement was not entirely true. He said he did not mention Ayers in this first statement because he knew Ayers had killed in the past and he was afraid for himself and his family. He said he was not arrested after giving his first statement. He said he was told to sign and date the statement but that he did not read it before he did so. He said that a neighbor told him on June 19 that some detectives had come looking for him. He said that he called Sergeant Simms and that Simms said he wanted the defendant to look at a picture. He said Simms came to his home with another detective, who grabbed and handcuffed him. He said they drove him to the station, where he was handcuffed to a chair and interrogated. He said Simms told him, "I can't stand for people to lie to me. I know how to deal with you." He acknowledged giving a statement on June 19, but he said he did not say some of what was included in the statement. In particular, he said he did not tell Simms that he was involved in a plan to rob the victim. He said he was not given a chance to read the statement before he signed it. He said he just followed Simms's order to sign and initial the statement.

The defendant testified that he did not see Curtis between the time of the shooting and the time that he talked with the police. He said he did see Ayers during this time, as Ayers often hung around the area in front of the defendant's apartment with other gang members. The defendant said he thought Ayers did this to send a message to him that he was being watched. He said that after he was arrested, he saw both Curtis and Ayers and received many threats from Ayers, including threats against his son and his fiancee. He said Ayers gave him an affidavit to give to the defendant's attorney that said Curtis and Ayers were not responsible for the victim's death. He said Ayers

_____

[2]The defendant later explained that Neely Park is the same place as Will Carruthers Park.

-6-

continued to make threats against him and his son until about two or three weeks before the defendant's trial.

On cross-examination, the defendant acknowledged that he was convicted of theft of property in 1997 and 1998 and of aggravated burglary in 1995. He admitted that Ayers had lived with him and Terry for a time in 2003, but he said he was not afraid of Ayers at that time. He said that Ayers did not point the gun at him when Ayers told him to drive the car and that he never saw Curtis with a gun. He acknowledged that a police car was behind him while he was driving the victim to the park, but he said he did not feel like he had the choice to pull over at that time. He denied that he was trying to avoid getting caught. He said he helped push the victim out of the car even though Curtis did not threaten him at the time. He acknowledged that there was a time at the park when he was in the driver's seat of the car and Curtis was outside but that he did not drive away. He acknowledged that he also could have driven off without Curtis while he was waiting for Curtis at Marlow's. Instead of leaving Curtis, he went inside Marlow's and told Curtis to hurry. He denied that he went to Marlow's to clean up. He said that when he and Curtis drove back to the apartment complex, he did not follow Curtis' instructions regarding where to park the car. He denied that Curtis told him they recovered $20 from the victim, as was stated in his June 19 statement. He said he did not recall telling the police that.

The defendant acknowledged that he did not tell the police the truth on June 14. He said he told them on June 19 that his first statement was not true. He acknowledged that he never told Simms that Ayers had been threatening him. He said that he decided to tell police the truth during the second interrogation because his fiancee was preparing to move and he felt less threatened.

Based on the foregoing evidence, the jury found the defendant guilty of the charged offenses of first degree felony murder and especially aggravated robbery. The jury sentenced him to life for murder, and the trial court imposed a concurrent sentence of twenty years for the robbery conviction.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant challenges the sufficiency of the convicting evidence. He argues that the evidence was not sufficient to overcome his trial testimony that he was not a participant in the robbery of the victim. The state counters that the evidence was sufficient and that the jury resolved conflicts in the evidence and the credibility of witnesses in favor of the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence; rather, we presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

The defendant was convicted of felony murder, which is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery . . .," T.C.A. § 39-13-202(a)(2), and especially aggravated robbery, which is a robbery "[a]ccomplished with a deadly weapon" and "[w]here the victim suffers serious bodily injury," T.C.A. § 39-13-403(a). See also T.C.A. § 39-13-401(a) (defining robbery). The defendant essentially argues that because he testified that he was not a participant in the robbery, the evidence was not sufficient to support his convictions for especially aggravated robbery and felony murder. However, we must examine this issue after viewing the evidence in the light most favorable to the state, and in that light, the evidence showed that the defendant confessed that he was aware of and agreed to participate in a robbery scheme against the victim with Curtis and Ayers. The evidence also showed that a robbery was committed against the victim, wherein Curtis recovered football equipment, around $20, and crack cocaine. The evidence further showed that Ayers shot and killed the victim during the perpetration of the intended robbery. The jury had the task of judging the credibility of witnesses and resolving conflicts in the testimony. The jury's verdict indicates that it resolved those issues in favor of the state, and it is not within the province of this court to overcome those factual determinations. We conclude that the evidence was sufficient to support the defendant's convictions.

## II. ADMISSION OF PHOTOGRAPHS

The defendant contends that the trial court erred in admitting photographs depicting the stippling on the defendant's eyes. He argues that the photographs were cumulative and prejudicial and should have been excluded under Tennessee Rule of Evidence 403. The state contends that the photographs were properly admitted because they were relevant and their probative value was not substantially outweighed by other considerations.

The particular photographs the defendant contests are two blown-up pictures, each depicting one of the victim's eyes. Each eye is being held open with Dr. Deering's hand. Traces of blood around the victim's eyes are visible. The photographs show the red blood vessels of the victim's eyes, as well as small red spots, which Dr. Deering identified as stipple. Dr. Deering testified that the stippling indicated that the victim was within six and twenty-four inches from the gun and that he was facing the gun with his eyes open when he was shot. In ruling that the photographs were admissible, the trial court stated:

> Well, I think the State has a right to show that he was looking at the gun and it was close when it went off. Obviously I will be charging like reckless homicide and criminally negligent homicide, and I think the jury has a right to see this evidence and to decide whether or not this killing was connected to the robbery itself.
>
> So - - and I don't see anything prejudicial - - unfairly prejudicial about them at all. There are some broken blood vessels it appears. But there's no - - they are not gory and there's no wounds. So I am going to allow them.

-8-

The admissibility of photographs is a matter committed to the sound discretion of the trial court and will not be overturned on appeal without a clear showing of abuse of that discretion. State v. Porterfield, 746 S.W.2d 441, 450 (Tenn. 1988). A photograph is admissible if it is probative to some issue in the case and if its prejudicial effect does not outweigh its probative value. State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978); see also Tenn. R. Evid. 403 (allowing the exclusion of evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence"). Even photographs of a gruesome and horrifying nature may be admitted into evidence if they are relevant and not unfairly prejudicial. Banks, 564 S.W.2d at 950-51.

Evidence is relevant when it has any tendency to establish a fact, bearing on the outcome of the action, as more or less probable than without that evidence. Tenn. R. Evid. 401. Specifically, evidence can be relevant if it aids the testimony of the medical examiner. See State v. Bush, 942 S.W.2d 489, 515 (Tenn. 1997) (holding that photographs were relevant to supplement the testimony of the medical examiner and investigative officers in showing the cause of death and the violence of the attack); see, e.g., State v. Barnard, 899 S.W.2d 617, 623 (Tenn. Crim. App. 1994). In the present case, the photographs of the victim's eyes were used to supplement the testimony of Dr. Deering, the medical examiner, regarding stippling. As the trial court found, the evidence of stippling was particularly relevant to the issue of whether the victim was killed during the commission of a robbery, which is an element of the charged offense of felony murder. The evidence corroborates the defendant's statement to police that Ayers shot the victim while reaching into the window of the victim's car and while the victim was attempting to grab the gun. The credibility of the defendant's statement was essential to the state's case. The pictures are not so gruesome and disturbing that their prejudicial effect would outweigh their probative value. The trial court did not abuse its discretion in admitting the photographs into evidence.

## CONCLUSION

Based on the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE

-9-